**DRESSER INDUSTRIES, INC. and Consolidated Subsidiaries, Petitioners–Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 89–4809.

United States Court of Appeals, Fifth Circuit.

Sept. 19, 1990.

John C. Klotsche, Gregory P. Gunderson, Jerrold E. Miertschin, Robert H. Albaral, Baker & McKenzie, Dallas, Tex., for petitioners-appellants.

William F. Nelson, Chief Counsel, I.R.S., Bruce R. Ellisen, Gary R. Allen, Chief, Charles Bricken, John A. Dudeck, Jr., David English Carmack, Appellate Section, William S. Rose, Asst. Atty. Gen., Dept. of Justice, Tax Div., Washington, D.C., for respondent-appellee.

Before GOLDBERG, GEE, and WILLIAMS, Circuit Judges.

GOLDBERG, Circuit Judge:

Dresser Industries ("Dresser") petitioned the Tax Court for a redetermination of deficiencies for the 1976 and 1977 tax years which the Commissioner of Internal Revenue ("Commissioner") alleged resulted from an improper calculation of the combined taxable income attributable to Dresser and its wholly-owned export subsidiary. The Commissioner claimed that Dresser improperly calculated the amount of interest expense allocable to export income pursuant to code sections 994 and 861, and that Dresser failed to directly deduct the discount loss on certain export receivables from gross export receipts in accordance with Treas.Reg. 1.994–1(c)(6)(v).[1] The Tax Court held for the Commissioner on both issues and Dresser appeals. AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

1. Throughout this opinion, references to applicable sections of the Internal Revenue Code will simply be made by section number. The code sections and Treasury Regulations discussed will be those in effect for the tax years at issue unless otherwise noted.

## THE FACTS

The facts in this case have been fully stipulated by the parties and only a brief summary is necessary at this point. Additional facts relevant to the two issues presented on appeal are included in the discussion of those issues.

Dresser is a worldwide supplier of technology, products, and services to industries involved in the development of energy and natural resources. In January 1972, Dresser established Dresser International Sales Corp. ("International"), a wholly-owned subsidiary, which qualified as a Domestic International Sales Corporation (DISC) under code section 992. The tax code provides substantial tax benefits for companies that establish DISCs by deferring taxes on a portion of DISC income. Dresser and International entered into an agreement under which Dresser appointed International as its exclusive agent for the sale of export property as defined in code section 993(c). As part of the agreement, Dresser paid International a commission equal to the maximum commission allowable under code section 994. For the 1976 and 1977 tax years, Dresser calculated the maximum commission in accordance with the "50–50 combined taxable income" and "4 percent gross receipts" methods described in code section 994(a).

In 1976 and 1977, Dresser earned interest income, worldwide, of $36 million from the investment of surplus cash. During this same period, Dresser incurred $58.8 million of interest expense, none of which is directly traceable to export sales made through International. In calculating combined taxable income ("CTI") for the tax years at issue in this case, Dresser allocated net interest expense of $22.8 million ($58.8 million interest expense minus $36 million interest income) among its divisions on the basis of the assets of each division, and between the domestic and export sales of each division on the basis of the dollar volume of sales in each category. Using this method, Dresser allocated $2,202,097 and $1,175,226 of its net interest expense to gross income from export sales in computing CTI for the respective tax years.

In an unrelated practice, International purchased, with recourse, undivided fractional interests in Dresser's accounts receivable which arose from the sale of export property during the tax years in question. International purchased the export receivables at a ten percent discount from their face value. The parties have stipulated that this constituted an arm's length purchase price for the receivables. In 1976 and 1977, International realized discount income of $3,774,098 and $5,709,609 from the collection of the export receivables it had purchased at a discount from Dresser. The parties have stipulated that International's discount income constitutes "qualified export receipts" under code section 993(a) and that Dresser's discount losses are deductible under code section 165.

In its calculation of combined taxable income for 1976 and 1977, Dresser allocated its discount losses among all of its divisions based upon the export sales of each division, and then apportioned the entire discount loss of each division to gross income from the export sales of that division. Using this method, Dresser allocated the entire loss attributable to export receivables to gross income from export sales in its computation of combined taxable income.

Dresser subsequently asserted to the Tax Court that its discount losses should have been allocated among all of its divisions in keeping with the same allocation method it had used for its net interest expense. This allocation method would have the effect of "untying" the discount loss attributable to export receivables from gross export income. Thus, Dresser contended that only $1,072,203 and $819,971, respectively, of discount expense should have been allocated to gross receipts from exports for the 1976 and 1977 tax years, instead of the total discount losses mentioned above.

The Commissioner claimed that Dresser's approach to allocating interest income and discount losses to DISC income were improper. The Commissioner argued that under the applicable code sections, gross interest expense, not net interest expense,

must be allocated to gross export receipts for purposes of determining combined taxable income. Furthermore, the Commissioner stated that under the applicable Treasury Regulations, discount loss from export receivables must be deducted directly from export income, not allocated proportionately to income derived from export and non-export operations. According to the Commissioner, Dresser's interest netting practice, and its suggested approach to the allocation of discount losses, would result in an overstatement of combined taxable income eligible for favorable tax treatment under the DISC legislation. The Tax Court agreed with the Commissioner on both of these issues.

## DISCUSSION

### I. Background

The Domestic International Sales Corporation (DISC) is a creation of U.S. tax law, conceived in the early 1970s [2] as part of an overall strategy to boost U.S. exports by providing tax incentives to companies involved in export trade.[3] Typically, a DISC is a paper company without facilities, employees, or inventory of its own. *See Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 1044, 218 Ct.Cl. 1978 (1978) (DISC is no more than "shell corporation with no employees"). "In essence, a DISC acts as a paper broker of its parent corporation's export products. A DISC skims the export profits of the parent corporation by taking 'commissions' on the parent's export sales." [4] Substantial tax benefits are available to exporters who set up DISCs because the tax on a portion of

DISC income is deferred, perhaps indefinitely.[5]

These benefits, however, are not unlimited. Although the DISC itself is not taxed on income from export sales, its shareholders are taxed on a specified percentage of DISC taxable income as if a dividend distribution had been made at the end of the tax year. In turn, DISC taxable income, from which this "deemed" distribution is calculated, is based on a complex statutory framework that establishes a "deemed" transfer price for export goods provided to the DISC by its parent or related supplier. As part of the original DISC legislation, Congress set out three alternative formulas for determining this "deemed transfer price": (1) 4 percent of "qualified export receipts"; (2) 50 percent of the "combined taxable income" of the DISC and its "related supplier" (typically the parent); or (3) the arm's length pricing convention provided in code section 482. *See* 26 U.S.C. § 994(a). Dresser chose alternative (2), in which the transfer price, and ultimately DISC taxable income, is based on combined total income ("CTI") of the DISC and its parent. Under this alternative, there is a direct relationship between CTI and the amount of export income that qualifies for deferred treatment—the larger CTI, the larger the tax benefit. It is Dresser's approach to calculating CTI that gives rise to the issues in this case.

### II. Interest Netting

Combined taxable income is not defined by the code. In the legislative history ac-

**2.** Revenue Act of 1971, Pub.L. No. 92–178, 85 Stat. 535 (1971) (codified as amended at 26 U.S.C. §§ 991–997). Tax law pertaining to DISCs was substantially revised by the Tax Reform Act of 1984, Pub.L. No. 98–369, 98 Stat. 494 (1984) (codified in scattered sections of 26 U.S.C.). *See generally* Note, *The Making of a Subsidy, 1984: The Tax and International Trade Implications of the Foreign Sales Corporation Legislation*, 38 Stan.L.Rev. 1327, 1334–55 (1986).

**3.** "To provide tax incentives for U.S. firms to increase their exports, [the Revenue Act of 1971 provides] tax deferral for export-related profits. This tax deferral will be granted on profits so long as they are retained in a new type of U.S.

corporation known as a Domestic International Sales Corporation or a "DISC." H.R.Rep. No. 533, 92d Cong., 1st Sess., *reprinted in* 1971 U.S. Code Cong. & Admin.News 1825, 1831 [hereinafter "H.R.Rep. No. 533," with specific page references cited to 1971 U.S.Code Cong. & Admin.News]; *see also* S.Rep. No. 437, 92d Cong., 1st Sess., *reprinted in* 1971 U.S.Code Cong. & Admin.News 1918, 1928 [hereinafter "S.Rep. No. 437," with specific page references cited to 1971 U.S.Code Cong. & Admin.News].

**4.** Note, *supra* note 2, at 1332.

**5.** *Id.* at 1333.

companying the DISC laws, however, Congress specified that:

> [T]he combined taxable income from the sale of the export property is to be determined generally in accordance with the principles applicable under section 861 for determining the source (within or without the United States) of the income of a single entity with operations in more than one country. These rules generally allocate to each item of gross income all expenses directly related thereto, and then apportion other expenses among all items of gross income on a ratable basis. Thus, the combined taxable income of a DISC and a related person with respect to the sale by the DISC of export property would be determined by deducting from the DISC's gross receipts the related person's cost of goods sold with respect to the property, the selling, overhead and administrative expenses of both the DISC and the related person which are directly related to the production or sale of the export property and a portion of the related person's and the DISC's expenses not allocable to any specific item of income, such portion to be determined on the basis of the ratio of the combined gross income from the export property to the total gross income of the related person and the DISC.[6]

The parties in this case do not dispute the amount of gross export receipts attributable to the DISC, nor do they dispute the cost of the export goods sold. And, with the single exception of discount losses on receivables—the subject of the second issue on appeal—they do not dispute the amount of any expenses directly related to the production or sale of the export property. The dispute arises over the apportionment of Dresser's interest expense, an expense which the parties agree is not directly allocable to Dresser, to International, or to any specific item of income. The Commissioner argues that Dresser must apportion a ratable share of its gross interest expense to the DISC. Dresser, on the other hand, argues that it is entitled to offset its interest income against its gross interest expense, and to apportion a ratable share of the resulting net interest cost to its DISC. The practical result of this netting process is to decrease the amount of interest expense to be apportioned, thus increasing CTI and the tax benefit available to Dresser from DISC operations. The Tax Court examined these two suggested approaches, agreed with the Commissioner, and disallowed Dresser's attempt to increase CTI by allocating net interest expense.

### A. Standard of Review

■ The standard of review for U.S. Tax Court decisions is the same as it is for civil actions decided by a federal district court. 28 U.S.C. § 7482(a). Findings of fact are upheld unless clearly erroneous. *Commissioner v. Duberstein*, 363 U.S. 278, 291, 80 S.Ct. 1190, 1199–1200, 4 L.Ed.2d 1218 (1960); *Killingsworth v. Commissioner*, 864 F.2d 1214, 1217 n. 1 (5th Cir.1989); *Laney v. Commissioner*, 674 F.2d 342, 345 (5th Cir.1982). For the Tax Court's conclusions of law, however, we are free to review on a de novo basis. *Killingsworth, supra*, 864 F.2d at 1217 n. 1; *Fender v. United States*, 577 F.2d 934, 936 (5th Cir. 1978). In the case before us there is no substantial factual dispute. Both parties stipulated to the facts upon which the Tax

---

**6.** H.R.Rep. No. 533 at 1887–88; S.Rep. No. 437 at 2013–14. The IRS incorporated the Congressional reference to code section 861 in its own definition of CTI:

> (6) For purposes of this section, the combined taxable income of a DISC and its related supplier from a sale of export property is the excess of the gross receipts (as defined in section 993(f)) of the DISC from such sale over the total costs of the DISC and related supplier which relate to such gross receipts....
>
> ....

> (iii) Costs (other than the costs of goods sold) which shall be treated as relating to gross receipts from sales of export property are (a) the expenses, losses and other deductions definitely related, and therefore allocated and apportioned, thereto, and (b) a ratable part of any other expenses, losses, or other deductions which are not definitely related to a class of gross income, determined in a manner consistent with the rules set forth in § 1.861–8.

Treas.Reg. 1.994–1(c)(6).

Court based its decision. The first issue on appeal, whether the Tax Court erred in rejecting Dresser's netting approach to interest income and expenses under code sections 861 and 994(a)(2), presents a question of law related solely to the court's interpretation of the applicable Code provisions. Thus, we review the Tax Court's determination on this issue de novo.

### B. Precedent—Is *General Portland* Controlling?

In support of its interest netting argument, Dresser cites this court's decision in *General Portland Cement Co. v. United States*,[7] where we were faced with a similar question of the proper allocation of interest expenses. In *General Portland*, a cement producer sought a refund of federal taxes paid on income from its mining operations. Under code section 613(a), the taxpayer was entitled to a depletion deduction for mining activities, limited to 50 percent of its "taxable income from the [mining] property." Taxable income from mining property was defined as gross income from the property less all allowable deductions attributable to mining, including that portion of the interest expense properly allocable to the mining phase of its business.[8] The taxpayer claimed that before making the allocation, it was entitled to subtract interest income from interest expense, and thereby to allocate only net interest costs to income from its mining operations. The government argued against this practice, stating that netting interest income and expenses was tantamount to allowing the taxpayer to include non-mining income (interest income) in its calculation of gross income from mining operations. This court rejected the government's argument, and held that the "taxpayer's actual interest cost is the net amount, and that taxpayer can offset its interest income against its interest expense" in calculating taxable income from mining for purposes of the 50 percent limit

on depletion deductions. *General Portland, supra,* at 344.

The holding in *General Portland* was based in part on our understanding of the true cost of borrowing money, in part on equitable considerations, and in part on the purpose underlying section 613(a)'s 50 percent limit. We stated: "Whether taxpayer's interest income is part of 'gross income from mining' is not ... the same question as whether taxpayer's interest income is related to its actual cost for interest on borrowed funds.... Taxpayer's actual cost of interest is its net interest expense." *Id. Accord Ideal Basic Indus. v. Commissioner,* 82 T.C. 352, 402 (1984). From this premise we reasoned that the taxpayer's gross interest expense represented an "inflated" cost of borrowing, and we concluded that calculating the maximum depletion deduction based on this inflated cost was "inequitable and in violation of the purpose behind the 50 percent limit." *General Portland, supra,* 628 F.2d at 344 & n. 61.

Dresser contends that the economic logic of our opinion in *General Portland* governs the calculation of the "interest expense" allocable to International. Although Dresser acknowledges that *General Portland* was decided under code section 613(a) and not section 994, it asserts that the difference is without legal significance because the "legislative purposes for, and the conceptual statutory framework of, these two Internal Revenue Code provisions are in all material respects identical."[9]

The Tax Court also recognized the similarity between Dresser's position and that of the taxpayer in *General Portland*, stating:

> [T]he limitation provision for the percentage depletion deduction is in certain respects "conceptually" analogous to section 994(a)(2). First, both the percentage depletion deduction and DISC provisions were enacted to provide special tax incentives to encourage taxpayers to engage in a designated activity (i.e., mining or

---

**7.** 628 F.2d 321 (5th Cir.1980), *cert. denied,* 450 U.S. 983, 101 S.Ct. 1519, 67 L.Ed.2d 818 (1981).

**8.** *See* Treas.Reg. 1.613–5(a).

**9.** Pet.Br. at 17.

exporting).  Second, the methods for computing the tax benefits of these provisions are similar.  Both the percentage depletion deduction allowable under section 613 and CTI under section 994(a)(2) have limitations which are determined by computing the taxable income realized by the taxpayer engaging in the designated activity.  In both cases income is computed by reducing gross income realized from the designated activity by deductions attributable thereto.  Finally, in both cases, the tax benefit is limited to 50 percent of the activity's income.

*Dresser Indus. v. Commissioner,* 92 T.C. 1276, 1284 (1989).  The Tax Court went on, however, to distinguish Dresser's case from *General Portland.*  First, the court cited relevant legislative history for the proposition that CTI was to be calculated "in accordance with section 861" of the code.  *Id.* at 1285.  In light of the legislative history, the court reasoned that Congress intended the provisions of Treas.Reg. 1.861–8, not this court's decision in *General Portland,* to control the calculation of interest expenses.  The court then analyzed section 1.861–8 of the Treasury Regulations, and concluded that the rules set forth therein do not provide for netting interest income and expense before allocation and apportionment.  Accordingly, the court rejected Dresser's attempt to net its interest income and expenses in order to determine CTI.

### C.  *General Portland* and DISC Law: Reconciliation

■■■ We acknowledge the distinction drawn by the Tax Court; section 861 was neither implicated nor at issue in *General Portland.*  While we recognize the distinction, we do not share the Tax Court's conclusion that the expense allocation provisions of Treas.Reg. 1.861–8 are irreconcilable with Congressional intent, the purpose underlying the DISC legislation, or our decision in *General Portland.*[10]  The Tax Court's decision relied on the conclusion that Treas.Reg. 1.861–8(e)(2) "does not provide for the netting of interest income and expense before allocation and apportionment."  *Dresser Indus. v. Commissioner, supra,* 92 T.C. at 1286.  Initially, we note that Treas.Reg. 1861–8(e)(2) was not in effect for the tax years at issue in this case.  The specific regulations in force during those years provided:

> From the items of gross income specified in §§ 1.861–2 to 1.861–7, inclusive, as being income from sources within the United States there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto and a ratable part of any other expenses, losses, or deductions which cannot definitely be allocated to some item or class of gross income.

Treas.Reg.  1.861–8(a)  (as  amended  in 1975).[11]  A literal reading of these provisions might support the Tax Court's conclusion that the regulations do not provide for "the netting of interest income and ex-

---

**10.**  A review of legislative history shows that Congress intended CTI to be calculated "generally in accordance with the principles" of section 861.  The tax court decision misquoted the relevant legislative history, omitting the crucial reference to general principles.  *Compare Dresser Indus. v. Commissioner,* 92 T.C. 1276, 1285 (1989) (CTI "is to be determined generally in accordance with section 861") *with* H.R.Rep. No. 533 at 1887 (CTI "is to be determined generally in accordance *with the principles applicable* under section 861") (emphasis added).  The tax court did, subsequently in its opinion, refer to the principles applicable under section 861, but only after analyzing the interest netting issue in accordance with a somewhat hypertechnical reading of Treas.Reg. 1.861–8(e)(2).  *Id.* at 1286–87.  This analytical approach may have contributed to an overly restrictive interpretation of Congressional intent in the narrow area of calculating CTI, to the detriment of Congress's overall intent with respect to the creation and taxation of DISCs.

**11.**  Treas.Reg. 1.861–8 was substantially revised in 1977.  The current version is applicable to tax years beginning after Dec. 31, 1976.  *See* Treas.Reg.  1.861–8(a)(5)(i)  (as  amended  in 1988).  The two years at issue in this case are Dresser's taxable years beginning November 1, 1975 and November 1, 1976.  Thus, the older version of the Treas.Regs. applies.  We need not and do not address the question whether interest netting is consistent with the current version of the Treasury Regulations, or whether current Regulations are consistent with Congressional intent underlying the original DISC legislation.

pense." We observe, however, that the same literal reading does not preclude such an approach. Dresser contends that these provisions merely set out the *method* of allocating "expenses, losses, and other deductions," but does not define the *amount* of the deductions to be allocated. We agree with this contention.

■ The specific code sections pertaining to DISCs, the legislative history, and the applicable Treasury Regulations are silent with regard to the amount of interest expense to be allocated in calculating CTI. The legislative history refers to the deduction of "selling, overhead and administrative expenses" directly related to production or sale of export property, and "a portion of ... expenses not allocable to any specific item of income." The words chosen by Congress to express its intent are not technical terms of art, but rather are widely recognized financial terms that generally describe the costs of conducting business. Similarly, Treas.Reg. 1.861–8 speaks of "expenses, losses, or other deductions." One interpretation of these provisions, and the one urged upon this court by the Commissioner, is that "expenses" means the specific itemized deductions set out in code section 161 et seq. Under this reading, the interest expense to be apportioned would be Dresser's gross interest expense. An equally acceptable interpretation, however, is the one chosen by this court in *General Portland,* in which the interest expense to be apportioned among related business operations is the actual cost of financing those operations. In our view, this latter reading is the more consistent with the Congressional purpose underlying the DISC legislation.

In providing for the allocation and apportionment of interest under code section 861, the current Treasury Regulations take the approach that money is fungible. *See* Treas.Reg. 1.861–8(e)(2)(i) (as amended in 1988). According to the regulations, "[t]his approach recognizes that all activities and property require funds and that management has a great deal of flexibility as to the source and use of funds.... When money is borrowed for a specific purpose, such borrowing will generally free other funds for other purposes and it is reasonable under this approach to attribute part of the *cost of borrowing* to such other purposes." *Id.* (emphasis added). Although the current Treasury Regulations are not controlling in the case at bar, this particular passage does illustrate the fundamental principle we expounded in *General Portland.*

Businesses (except for banks and other financial institutions) typically do not incur interest expense for the purpose of generating interest income. Instead, they borrow to finance their operations. In keeping with the principle of the fungibility of money, the cost of borrowing can be attributed, and therefore must be allocated, to all operations. This allocation process, however, should be viewed in light of the realities of business finance. Rarely, if ever, do the amount and timing of business borrowing directly correlate to specific investments. For instance, a business might borrow sufficient funds to finance its operations for the coming quarter. The business typically incurs the debt in a single transaction, even though its cash requirements are spread out over the ensuing three months. As a result, the business will have at least some borrowed funds on hand that are not required immediately but which may be required in the near future. To reduce the cost of holding these funds until they are actually needed, the business might invest in short-term, interest bearing instruments. *See Ideal Basic, supra,* 82 T.C. at 400. Alternatively, a business might decide to finance its operations by issuing long-term bonds or other securities. Because it may be impractical to retire these obligations prior to their maturity, the business will typically invest any cash surplus to offset the cost of carrying its long-term debt. If additional cash is needed, the business simply sells its investments rather than incurring additional debt. In either case, the total *cost of the borrowing* is the interest expense on the debt incurred, reduced by the interest earned on the investment of any temporary cash surplus.

■ In *General Portland,* we held that the actual cost of borrowing was the

amount properly allocable to mining operations for purposes of calculating the maximum depletion deduction. To do otherwise, we reasoned, would be to allocate a disproportionate share of the business's financing costs to a specific phase of its operations. We concluded that this would be inequitable and inconsistent with the purpose of percentage depletion allowance. Similarly, in the case of a DISC, requiring allocation of gross interest expenses would burden the DISC with a disproportionate share of the actual borrowing costs attributable to all operations, not merely to export operations. We do not believe that Congress contemplated or intended this result when it enacted the DISC legislation, and we find nothing in the statute, the legislative history, or the applicable Treasury Regulations that contradicts our belief. Therefore, we hold that Dresser may offset its interest income against its interest expense and allocate the net interest expense to its DISC for purposes of calculating CTI.[12] The decision of the tax court with respect to Dresser's interest netting practice is reversed.

### III. Discount Losses

The second issue raised on appeal also pertains to calculation of CTI. Treas. Reg. 1.994–1(c)(6)(v) provides that:

> If an account receivable arising with respect to a sale of export property is transferred by the related supplier to a DISC ... for an amount reflecting a discount from the selling price taken into account in computing (without regard to this subdivision) combined taxable income of the DISC and its related supplier, then the combined taxable income from such sale shall be reduced by the amount of the discount.

The effect of this regulation is to allocate the deduction for discount losses attributable to the transferred receivables directly to gross export income for purposes of calculating CTI. The facts of this case illustrate the intended operation of Treas. Reg. 1.994–1(c)(6)(v). International is a commission DISC. Simply stated, this means that there is no physical transfer of export goods from Dresser to International for resale in the export market, no direct sale by International to the final purchaser, and no direct income to International as a result of the sale. International acts as a sales agent for Dresser's export goods and earns a sales commission. Dresser retains title to the export goods until the goods are sold to the final purchaser, and accounts receivable arising from the sale are initially held by Dresser. Instead of collecting on the accounts itself, Dresser then transfers or "sells" the accounts to International at a ten percent discount. Dresser incurs a loss on the transfer,[13] while International realizes a gain in the form of discount income when it finally collects the receivables.[14] Under the specific rules set out in Treas. Reg. 1.994–1(c)(6)(v), the discount loss incurred as a result of the post-sale transaction between Dresser and International

---

**12.** On appeal, the Commissioner also claims that netting interest income and expense would affect the ratio by which interest expenses are allocated. Allocations are to be based on the ratio of "gross income from the export property to the total gross income of the related person and the DISC." H.R.Rep. No. 533 at 1888. The Commissioner argues that allowing Dresser to net interest income (an item of gross income) against interest expense would result in the understatement of Dresser's gross income from export and non-export operations. However, Dresser does not contest the Commissioner's approach to calculating combined gross income or the appropriate allocation ratio. Appellant's Reply Brief at 4 ("it is not Dresser's position that these "gross" figures should include the netting of interest expense and interest income").

**13.** The parties have stipulated that the discount loss is a recognizable loss from the sale of property under code section 165.

**14.** Code section 993(a)(1)(D) defines qualified export receipts as including "gross receipts from the sale, exchange, or other disposition of qualified export assets." Code section 993(b)(3) includes within the definition of a corporation's qualified export assets "accounts receivable ... which arise by reason of transactions of such corporation or of another corporation which is a DISC and which is a member of a controlled group which includes such corporation...." Thus, gains attributable to International's "disposition" of the export accounts receivable would be qualified export receipts for purposes of calculating CTI.

must be deducted directly from gross export receipts in the calculation of CTI.

Dresser claims, however, that Treas.Reg. 1.994–1(c)(6)(v) cannot be reconciled with the statutory scheme or Congressional intent as to how expenses should be allocated in calculating CTI. Dresser argues that the discount loss from the transferred receivables must be allocated in accordance with the principles of code section 861. According to Dresser, section 861 requires discount losses to be apportioned among all items of gross income, and not, as provided for in Treas.Reg. 1.994–1(c)(6)(v), deducted dollar-for-dollar from DISC income. Dresser characterizes the disputed regulation as "an overreaching and unauthorized attempt by the Treasury to legislate indirectly by regulation a limitation on the DISC export tax incentives contrary to Congressional intent" and urges this court to strike the regulation as invalid.[15]

### A. Standard of Review: Legislative or Interpretive?

Unlike the first issue raised in this case, the dispute over the proper treatment of discount losses does not involve a statutory interpretation to determine the amount of the expense to be allocated. The parties agree on the amount of the discount loss which is related to the transfer of export accounts receivable from Dresser to International. Rather, the issue requires this court to decide whether Treas.Reg. 1.994–1(c)(6)(v) sets forth a valid method of allocating discount losses with respect to export income.

▪ In *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982), the Supreme Court explained the analytical framework within which courts are to review Treasury Regulations. Writing for the Court, Justice Brennan said:

> Deference is ordinarily owing to the agency construction if we can conclude that the regulation "implement[s] the congressional mandate in some reasonable manner." But this principle of deference, while fundamental, only sets "the

framework for judicial analysis; it does not displace it."

> The framework for analysis is refined by consideration of the source of the authority to promulgate the regulation at issue. [Where] [t]he Commissioner has promulgated [a regulation] only under his general authority to "prescribe all needful rules and regulations".... "we owe the interpretation less deference than a regulation issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision."

*Vogel, supra,* at 24, 102 S.Ct. at 827 (citations omitted); *accord, Rowan Companies v. United States,* 452 U.S. 247, 253, 101 S.Ct. 2288, 2292–93, 68 L.Ed.2d 814 (1981); *see also United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 449–50, 19 L.Ed.2d 537 (1967) (role of judiciary "begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate in some reasonable manner"). Thus, the weight we are to accord the regulation in question depends on the source of authority under which the regulation was promulgated.

Regulations "issued under a specific grant of authority to ... prescribe a method of executing a statutory provision" are to be accorded more weight than those promulgated under a more general authority. The former category of regulations, sometimes characterized by the courts as "legislative," are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *United States v. Morton,* 467 U.S. 822, 834, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680 (1984); *Schweiker v. Gray Panthers,* 453 U.S. 34, 44, 101 S.Ct. 2633, 2640–41, 69 L.Ed.2d 460 (1981); *Batterton v. Francis,* 432 U.S. 416, 424–26, 97 S.Ct. 2399, 2404–06, 53 L.Ed.2d 448 (1977). The latter category of regulations, sometimes character-

---

**15.** Pet.Br. at 8.

ized as "interpretive," must "harmonize[ ] with the plain language of the statute, its origin, and its purpose." *Rowan, supra,* 452 U.S. at 253, 101 S.Ct. at 2292; *National Muffler Dealers Ass'n v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed. 519 (1979).

In this case, the Tax Court decided that Treas.Reg. 1.994–1(c)(6)(v) was issued under Congress's specific grant of authority to the Treasury Secretary to "prescribe regulations setting forth ... rules which are consistent with [intercompany pricing rules] in the case of commissions...."[16] Accordingly, the Tax Court gave the disputed regulation controlling weight. Dresser contends, however, that Treas. Reg. 1.994–1(c)(6)(v) was not issued under a specific grant of authority, but instead, was issued under the Secretary's general rulemaking authority as set out in code section 7805.[17] In support of this contention, Dresser directs the court's attention to the fact that the Treasury Decision promulgating 1.994–1(c)(6)(v) states that the regulation "is issued under the authority contained in section 7805 of the Internal Revenue Code." *See* T.D. 7435, 1976–2 C.B. 238, 241; *see also* 40 Fed.Reg. 29,871, 29,872 (1975) (proposed July 16, 1975) (specific reference to section 7805 as authority for proposed version of Treas.Reg. 1.994–1(c)(6)(v)). Dresser asserts the initial characterization of the regulation as one promulgated under code section 7805 is controlling insofar as it illustrates the Treasury's intent and understanding of its rulemaking authority. Dresser correctly states that regulations promulgated under section 7805 are interpretive in nature and thus deserving of less deference by the court. Finally, proceeding from the assumption that Treas.Reg. 1.994–1(c)(6)(v) is in fact interpretive, Dresser attempts to show that the regulation is inconsistent with the stat-

utory scheme and therefore invalid under the less deferential standard.

### B. Determining Source of Authority: Form over Substance

■ A review of the caselaw in this and other circuits shows that Dresser's argument is without merit. In an analysis to determine the promulgating authority and the relative weight we should accord a particular regulation, we are not bound by mere nomenclature used by the issuing agency. Instead, we examine both the statutory language and the regulation itself to determine if in fact the agency has engaged in rulemaking under a specific or general grant of authority. *See Brown Express, Inc. v. United States,* 607 F.2d 695, 700 (5th Cir.1979) ("[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact.") (quoting *Lewis–Mota v. Secretary of Labor,* 469 F.2d 478, 481 (2d Cir.1972); *see also LeCroy Research Systems v. Commissioner,* 751 F.2d 123, 126 (2d Cir.1984) (regulation held to be legislative where it was "within both the express authority and the spirit of the statute").

In *CWT Farms, Inc. v. Commissioner,* 755 F.2d 790 (11th Cir.1985), *cert. denied,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986), the Eleventh Circuit took this approach to determine the validity of Treas. Regs. 1.993–2(d)(2) and 1.994–1(e)(3). If the *CWT* court had taken the expedient course urged by Dresser, it could have quickly decided that the disputed regulations were interpretative because the Treasury Decisions that promulgated the regulations stated that they were issued under the authority granted in code section 7805. *See* T.D. 7435, 1976–2 C.B. 238, 241; T.D. 7514, 1977–2 C.B. 266, 289). The Eleventh

---

**16.** 26 U.S.C. § 994(b) (as amended).

**17.** Code section 7805 generally authorizes the Treasury Secretary to issue rules and regulations interpreting the tax code. Section 7805 provides, in pertinent part:

  (a) *Authorization.*—Except where such authority is expressly given by this title to any person other than an officer or employee of

the Treasury Department, the Secretary shall prescribe all needful rules and regulations for the enforcement of this title, including rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue.

26 U.S.C. § 7805.

Circuit, however, refused to elevate form over substance. Instead, the *CWT* court conducted a detailed analysis to determine whether, in fact, the disputed regulations were legislative or interpretive. *CWT, supra,* 755 F.2d at 797–801; *compare Gehl Co. v. Commissioner,* 795 F.2d 1324, 1329–30 (7th Cir.1986) (unclear whether Treas. Reg. 1.993–2(d)(2) was issued under code sections 994(b) or 7805; court assumed, without deciding, that challenged regulation was issued pursuant to code section 7805) *and LeCroy Research Systems, supra,* 751 F.2d at 125–26 (Treas.Reg. 1.994–1(e)(3)(i) was issued under authority of code section 994(b)) *with Anchor Hocking Corp. v. United States,* 11 Cl.Ct. 173 (1986) (court assumed without analysis that Treas.Reg. 1.994–1(c)(6)(v) was interpretive, but upheld the regulation under the higher standard).

■ Like the Eleventh Circuit, we believe that the proper approach to determining the source of authority for a particular regulation involves an examination of statutory language and of the regulation itself. There is no doubt that Congress intended to accommodate commission DISCs when it enacted the original DISC legislation. The legislative history accompanying the Revenue Act of 1971 directed the Secretary of the Treasury to "prescribe by regulations intercompany pricing rules, consistent with those provided by the bill, in the case of export transactions where the DISC does not take title to the property, but instead, acts as a commission agent for the sale...." H.R.Rep. No. 533 at 1888. Similarly, Code section 994(b) provides:

(b) *Rules for commissions, rentals, and marginal costing.*—The Secretary shall prescribe regulations setting forth—

(1) rules which are consistent with the rules set forth in subsection (a) for the application of this section in the case of commissions, rentals and other income, and

(2) rules for the allocation of expenditures in computing combined taxable income under subsection (a)(2) in those cases where a DISC is seeking to establish or maintain a market for export property.

26 U.S.C. § 994(b) (as amended). The references to "subsection (a)" are references to the three alternative methods of calculating a "deemed" transfer price for export goods under code section 994(a) which we discussed in the first part of this opinion. Technically speaking, section 994(a)'s transfer price formulas can be applied only where there is an actual transfer of export goods from the parent or related supplier to the DISC. However, code section 994(b) clearly indicates that Congress intended the profits of a commission DISC to be calculated on much the same basis—in other words, as if there *had* been an actual transfer of export goods to the DISC. Although Congress recognized the possibility of DISCs operating on a commission, rather than a buy-sell basis, the statutory language and the legislative history show that Congress intended the tax treatment of commission DISCs to be consistent with the treatment of buy-sell DISCs. Congress specifically authorized the Secretary to make rules ensuring that consistency.

In keeping with Congressional intent and the explicit mandate of code section 994(b), Treas.Reg. 1.994–1(d) provides:

(d) *Rules under section 994(a)(1) and (2) for transactions other than sales.* The following rules are prescribed for purposes of applying the gross receipts method or combined taxable income method to transactions other than sales:

. . . .

(2) *Commissions.* If any transaction to which section 994 applies is handled on a commission basis for a related supplier by a DISC and such commissions give rise to qualified export receipts under 993(a)—

(i) The amount of the income that may be earned by the DISC in any year is the amount, computed in a manner consistent with paragraph (c) of this section, which the DISC would have been permitted to earn under the ... combined taxable income method ... if the related supplier had sold (or leased) the property or service to the DISC and the DISC in turn sold (or subleased) to a third party ..., and

(ii) The maximum commission the DISC may charge the related supplier is the sum of the amount of income determined under subdivision (i) of this subparagraph plus the DISC's total costs for the transaction as determined under paragraph (c)(6) ["Combined Taxable Income"] of this section.

These provisions relate specifically to the calculation of the "deemed" transfer price of export goods in the case of a commission DISC, and thus fall squarely within the specific grant of rulemaking authority set out in code section 994(b). Furthermore, they incorporate by reference Treas.Reg. 1.994–1(c)(6), the source of the disputed regulation in this case.

A review of Treas.Reg. 1.994–1(c)(6) indicates that not all of the rules set out therein are exclusively related to commission DISCs. For instance, Treas.Reg. 1.994–1(c)(6)(i) generally accepts the taxpayer's method of accounting and designation of taxable year for purposes of determining which items of income and expense are used to calculate CTI. This provision would seem to pertain equally to buy-sell and commission DISCs. Similarly, 1.994–1(c)(6)(iii) provides that for purposes of calculating CTI, costs other than the cost of goods sold are to be allocated and apportioned in a manner consistent with Treas. Reg. 1.861–8. This provision would also seem to pertain equally to buy-sell and commission DISCs. It would be improper to conclude, therefore, that the mere incorporation by reference of 1.994–1(c)(6)'s provisions into Treas.Reg. 1.994–1(d) automatically brings these provisions within the purview of code section 994(b)'s specific grant of authority to make rules governing the transfer price of commission DISCs.

The particular regulation at issue here, however, is directed exclusively to the calculation of deemed intercompany transfer prices in the case of commission DISCs. As the Tax Court stated, "[i]t is clear that only a DISC operating on a commission basis can purchase export receivables from a related supplier, and consequently create discount governed by the regulation. This is necessarily so since a DISC operating on a buy-sell basis would, by definition, already hold export receivables." *Dresser Indus. v. Commissioner*, 92 T.C. 1276, 1291 (1989). From this premise, the Tax Court concluded that Treas.Reg. 1.994–1(c)(6)(v) "provides an intercompany pricing rule which is only applicable in the case of commissions, as authorized by section 994(b)(1)." *Id.*

We agree with the Tax Court's reasoning. The purpose of Treas.Reg. 1.994–1(c)(6)(v), read in conjunction with 1.994–1(d), is to put commission DISCs on the same footing as buy-sell DISCs for purposes of calculating CTI.[18] As such, it is

---

18. The explanation given for Treas.Reg. 1.994–1(c)(6)(v) is to eliminate the possibility of "double counting" of export income that arises when a commission DISC buys export receivables at a discount from its related supplier. *See* T.D. 7453 (justification for regulation and example of double counting). This double counting is only possible in the case of a commission DISC. Dresser argues that the possibility of double counting is not sufficient justification for a regulation that departs from the overall statutory scheme of allocating expenses in accordance with code section 861, and cites *Caterpillar Tractor Co. v. United States*, 589 F.2d 1040, 218 Ct.Cl. 1978 (1978) in support of its argument. The cases, however, are distinguishable. In *Caterpillar Tractor*, the court was faced with the issue of a potential double tax benefit under separate code provisions, one related to DISCs and the other to Western Hemisphere Trade Corporations (WHTC). *See* 26 U.S.C. §§ 921–922. The court struck down a regulation that excluded sales to a WHTC from the definition of export property contained in the DISC legislation. The court concluded that nothing in the statutory language prohibited the taxpayer from taking advantage of preferential tax treatment available under both code sections. By contrast, the case at bar involves only those code sections specifically related to DISCs. We find it highly unlikely that Congress intended to create the possibility of double benefits for one type of DISC, but not for others, within a single, integrated portion of the tax code. Moreover, both the statutory language and legislative history indicate that Congress intended for commission DISCs to be treated consistently with buy-sell DISCs. Thus, the reasoning of *Caterpillar Tractor* is inapposite.

Dresser also contends that the double counting benefit is not limited to commission DISCs. Dresser posits that "a buy-sell DISC may achieve the same 'double benefit' ... in the context of either multiple DISCs where a buy-sell DISC purchases an export receivable at a discount which was generated by the related commission

clearly consistent with legislative intent, and reasonably within the specific grant of rulemaking authority set forth in code section 994(b). We conclude that Treas.Reg. 1.994–1(c)(6)(v) is legislative in nature. As we stated previously, legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Dresser does not attempt to persuade this court, nor could it, that Treas.Reg. 1.994–1(c)(6)(v) is arbitrary, capricious, or manifestly contrary to code section 994 when read in light of the overall statutory framework. Therefore, we hold that Treas.Reg. 1.994–1(c)(6)(v) is a valid exercise of the Treasury Secretary's rulemaking power under the express grant of authority contained in code section 994(b).[19] In keeping with the provisions of this regulation, the discount losses incurred by Dresser in the transfer of accounts receivable to International must be deducted, dollar-for-dollar, from gross export receipts in the calculation of CTI.

## CONCLUSION

In view of the principles set out by this court in *General Portland*, we find that net interest income is the proper measure of the cost of borrowing that must be allocated to DISC income for purposes of computing CTI. The decision of the Tax Court with respect to the amount of interest expense to be allocated is REVERSED. We agree with the Tax Court's holding that Treas.Reg. 1.994–1(c)(6)(v) is legislative in nature and therefore entitled to controlling weight. Thus, we AFFIRM the Tax Court's decision with respect to the proper allocation of discount losses from export receivables. We REMAND this case to allow the Tax Court to calculate, consistent with this opinion, the amount of any tax refund or deficiency for the tax years in question.

DISC, or a DISC operating on both a buy-sell and commission basis." Pet.Rep.Br. at 23–24. Dresser's reasoning is flawed in that it presupposes the existence of favored treatment for commission DISCs, which favored treatment can subsequently be transferred to other, initially unfavored DISCs. Again, we find it highly unlikely that Congress intended to indirectly confer a double benefit on buy-sell DISCs by creating favorable treatment for commission DISCs which a buy-sell DISC might ultimately garner to itself.

19. Although it held that Treas.Reg. 1.994–1(c)(6)(v) was legislative, the tax court also stated that the regulation would be valid even if it were interpretive in nature. *Dresser Indus. v. Commissioner*, 92 T.C. 1276, 1291–92 (1989). The tax court's alternative justification for its decision followed the Claims Court's decision in *Anchor Hocking Corp. v. United States*, 11 Cl.Ct. 173, 177 (1986). In *Anchor Hocking*, the court reviewed Treas.Reg. 1.994–1(c)(6)(v) under an interpretive standard, and held that the regulation was "reasonable, not inconsistent, and in harmony with the statute's purpose, origin and language." Our disposition of this issue makes it unnecessary to review the disputed regulation under the less deferential standard. Our holding, however, is not inconsistent with, and should not be read to displace the Claims Court's holding in *Anchor Hocking*.