**BOWATER, INC. AND SUBSIDIARIES, formerly known as Bowater Holdings, Inc., Petitioner–Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellant.**

**No.  335, Docket 96–4039.**

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1996.

Decided March 3, 1997.

Robert T. Carney, Washington, DC (Fulbright & Jaworski, Washington, DC, on the brief), for Petitioner–Appellee.

David E. Carmack, Attorney, Tax Division, Department of Justice, Washington, DC (Loretta C. Argrett, Assistant Attorney General, Gary R. Allen, Pamela C. Berry, Attorneys, Tax Division, Department of Justice, Washington, DC, on the brief), for Respondent–Appellant.

Before: KEARSE, NORRIS [1], and LEVAL, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

This appeal requires us to interpret a Treasury regulation that was in effect during the tax years 1979 and 1980.  The Regulation provides in part: "[T]he aggregate of deductions for interest shall be considered related to all income producing activities and properties of the taxpayer and, thus, allocable to all the gross income which the income producing activities and properties of the taxpayer generate."  26 C.F.R. § 1.861–8(e)(2)(ii) (1978).[2]

---

1.  Honorable William A. Norris, of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

2.  We refer to § 1.861–8(e)(2) of the 1978 Treasury regulations as "the Regulation."  The relevant portion of the Regulation provides in full:

§ 1.861–8 Computation of taxable income from sources within the United States and from other sources and activities....

(e) Allocation and apportionment of certain deductions

In *Dresser Ind., Inc. v. Commissioner*, 92 T.C. 1276, 1286, 1989 WL 64601 (1989), the Tax Court interpreted the Regulation in favor of the Commissioner, reasoning that the Regulation spoke of allocating interest expense among all income producing activities, including activities that produce interest income, and did not provide "for the netting of interest income and expense before allocation and apportionment." *Id.* at 1285–86. The Tax Court's decision in *Dresser* was reversed by the Fifth Circuit. *Dresser Ind., Inc. v. Commissioner*, 911 F.2d 1128 (5th Cir.1990). In this case, the Tax Court followed *Dresser* without question. We think the Tax Court had it right the first time, and we reverse its decision for the taxpayer.

## I

Bowater, Inc. (Taxpayer) is a domestic corporation that produces wood pulp and other related products for sale to customers. During 1979 and 1980, Taxpayer wholly owned Bowater Southern Paper Corporation and Bowater Carolina Corporation. Southern Paper and Carolina Paper, in turn, wholly owned other corporations that qualified as domestic international sales corporations (DISCs) under § 992(a)[3] of the Internal Revenue Code.[4] During the relevant tax years, income from export sales that qualified as DISC income received highly preferential tax treatment in that DISC income

(1) In general. Subparagraphs (2) and (3) of this paragraph contain rules with respect to the allocation and apportionment of interest expense.... .
(2) Interest
(i) In general. The method of allocation and apportionment for interest set forth in this paragraph (e)(2) is based on the approach that money is fungible and that interest expense is attributable to all activities and property regardless of any specific purposes for incurring an obligation on which interest is paid. This approach recognizes that all activities and property require funds and that management has a great deal of flexibility as to the source and use of funds. Normally, creditors of a taxpayer subject the money advanced to the taxpayer to the risk of the taxpayer's entire activities and look to the general credit of the taxpayer for payment of the debt. When money is borrowed for a specific purpose, such borrowing will generally free other funds for other purposes and it is reasonable under this approach to

escaped corporate tax and was taxed solely to its shareholders, with a portion of that tax deferred. *See* 26 U.S.C. §§ 991, 995(b), (c).

To compute the amount of its DISCs' income, Taxpayer used the "50/50 combined taxable income" method set forth in § 994(a)(2). This method limits a DISC's taxable income to 50% of the "combined taxable income" (CTI) of the DISC and its related supplier attributable to export sales. The regulations pertaining to § 994(a)(2) provide that the expenses to be deducted from gross receipts in calculating CTI shall be determined in a manner consistent with § 1.861–8 of the regulations. 26 C.F.R. § 1.994–1. Accordingly, as the parties agree, we must interpret § 1.861–8 to decide this case.

In 1979 and 1980, Taxpayer filed consolidated federal income tax returns with its DISCs and their related suppliers. In the returns, Taxpayer computed the CTIs of its DISCs and their related suppliers by first allocating interest expense to interest income before allocating a portion of the remaining interest expense to income generated by the sales of export property through the DISCs. The effect of computing the CTIs in this manner was to reduce the portion of Taxpayer's taxable income that was not related to DISC export sales, thereby increasing the portion of Taxpayer's taxable income that

attribute part of the cost of borrowing to such other purposes.
(ii) Allocation of interest. Except as provided in subdivisions (iii) and (iv) of this subparagraph [Note: These exceptions are not applicable here.], the aggregate of deductions for interest shall be considered related to all income producing activities and properties of the taxpayer and, thus, allocable to all the gross income which the income producing activities and properties of the taxpayer generate, have generated, or could reasonably have been expected to generate. 26 C.F.R. § 1.861–8(e)(2)(i) & (ii) (1978).

3. All statute references are to the Internal Revenue Code of 1954 in effect during the tax years in issue.

4. The names of the DISCs are Southern Export Corporation and Carolina Export Company. For convenience, we refer to them as "DISCs," and to Southern Paper and Carolina Paper as their "related suppliers."

was attributable to DISC export sales, which in turn increased the portion of taxable income subject to the highly preferential tax treatment afforded to DISC income. The Commissioner claims that in shifting interest expense away from DISC income in order to maximize DISC income entitled to preferential tax treatment, Taxpayer accumulated tax deficiencies of $320,400 in 1979 and $686,700 in 1980.

## II

The Commissioner argues that Treasury regulation § 1.861–8(e)(2) is clear on its face, and requires a taxpayer to allocate interest expense ratably to *all* income producing activities, including activities that produce income in the form of interest. As the Tax Court did in *Dresser*, we agree with the Commissioner.

The plain language of Treasury regulation § 1.861–8(e)(2) controls the outcome of this case. The Regulation provides that "interest expense is attributable to *all* activities and property regardless of any specific purposes for incurring an obligation on which interest is paid," 26 C.F.R. § 1.861–8(e)(2)(i) (emphasis added), and "the aggregate of deductions for interest shall be considered related to *all* income producing activities and properties of the taxpayer and, thus, allocable to *all* the gross income which the income producing activities and properties of the taxpayer generate," 26 C.F.R. § 1.861–8(e)(2)(ii) (emphasis added). Interest is plainly a form of income, and activities that produce interest are plainly income producing activities. Thus, the Regulation requires that the aggregate of deductions for interest be allocated ratably to interest income on the same basis as it is allocated to *all* other income producing activities. The plain language of the Regulation allows for no exception.[5]

Taxpayer would have us amend the language "all income producing activities" to "all income producing activities except those that produce income in the form of interest." As the Commissioner argues, "*all* income pro-

ducing activities" includes all activities that use money to produce income, including income called "interest," "dividends," "rent," etc. "Interest" is nothing more than a label to describe income earned by putting money to work by selling its time value to others. Similarly, "dividend" is nothing more than a label to describe income earned by putting money to work by investing it in shares of stock. In the eyes of the law, there are important differences between debt and equity investments, but these differences are of no consequence for the purpose of Treasury regulation § 1.861–8(e)(2). What is of consequence is that both investments are income producing activities. That is, both involve the use of money to produce income, and the Regulation requires that deductions for interest expense be allocated to all income producing activities, with no distinction based on whether the income produced bears the label "interest" or "dividend" or any other appellation.

## III

### A

Taxpayer seizes upon an expression used in the Regulation—that "money is fungible"—to support its interpretation that the Regulation permits the allocation of interest expense first to interest income. This is ironic because the Regulation uses the concept that "money is fungible" to explain its mandate that interest expense be allocated to *all* income producing activities, and now Taxpayer wants us to use the same concept to amend the Regulation to create an exception to that very mandate. The Regulation uses the concept that "money is fungible" to explain why interest expense should be allocated across the board to all income producing activities:

> This approach [that money is fungible] recognizes that all activities and property require funds and that management has a great deal of flexibility as to the source and use of funds.... When money is

---

**5.** The Commissioner also finds support for its position in the legislative history of § 994(a)(2). Taxpayer argues that this provision is ambiguous and does not help to resolve the issue of whether

interest expense should be allocated first to interest income before the remaining interest expense is allocated to income from other income producing activities. We agree with Taxpayer.

borrowed for a specific purpose, such borrowing will generally free other funds for other purposes and it is reasonable under this approach to attribute part of the cost of borrowing to such other purposes.

26 C.F.R. § 1.861–8(e)(2)(i). Taxpayer extrapolates from the concept that money is fungible, the doctrine that "only *interest* [is] fungible." *See* Appellee's Br. at 19 n.19. According to Taxpayer, "these Regulations apply only to interest, and do not purport to make interest fungible with dividends, royalties, or any other form of income." *Id.* In other words, Taxpayer interprets the Regulation to mean that money paid in the form of interest expense is fungible only with money earned in the form of interest income, so the two sums must be balanced against each other to determine the amount of interest expense to be allocated to other forms of income. We find no support in the language of the Regulation for Taxpayer's argument. The Regulation says that *all* money is fungible, without exception for money that comes in as interest or goes out as interest, and uses this concept of fungibility to explain why interest expense must be allocated to all income producing activities. *See* 26 C.F.R. § 1.861–8(e)(2)(i). Taxpayer's tortured application of the principle that money is fungible does not justify amending the Regulation to provide an exception for interest income.

**B**

The only case Taxpayer relies on to support its position is *Dresser,* 911 F.2d at 1128.[6] In *Dresser,* the Fifth Circuit relies on its own judicial version of "economic reality" to justify the allocation of interest expense to interest income before any remaining interest expense is allocated to other income producing activities.

*Dresser*'s version of "economic reality" posits that a business typically borrows money in a single transaction to finance its operations, even though some of the borrowed funds are not required for immediate use.

*Id.* at 1135. To reduce the cost of holding these borrowed funds until they are actually needed, *Dresser* reasons, a business might invest in short-term, interest bearing instruments. *Id.* Thus, *Dresser* concludes, the "true cost of borrowing" to be allocated to all operations equals the interest expense on the debt incurred, reduced by any interest earned on the investment of any temporary cash surplus in interest bearing instruments. *Id.* at 1133, 1135.

Whatever might be said about *Dresser*'s theory of the "true cost of borrowing," it does not comport with the Regulation's concept that money is fungible. Taxpayer's reliance on *Dresser* is, therefore, misplaced. *Dresser* posits that interest expense is more related to interest income than it is to income by any other name. Yet, under the Regulation's concept that money is fungible, a cash surplus is simply available cash, and available cash from one income producing activity is interchangeable with cash from any other income producing activity. Indeed, cash positions may change daily, even hourly, as cash flows in from an array of sources, not just from interest bearing sources, and flows out to pay an array of expenses, not just interest expense. As the Regulation recognizes, management has a great deal of flexibility as to the source and use of its available funds, 26 C.F.R. § 1.861–8(e)(2)(i), and the management of these funds is a complicated process which the Regulation does not reduce to a single linear cash flow.

The Regulation posits that "all activities and property require funds," *id.,* and that every business activity ties up money that could otherwise be used to reduce debt, and thereby reduce interest expense. In other words, the Regulation implicitly takes the approach that all income producing activities contribute to the cost of borrowing money simply by tying up funds, and that investment in interest bearing securities is no different from investment in other income pro-

---

6. *Dresser* arose under an earlier version of the regulations that was much less clear than the Regulation at issue here. While the Regulation applicable to Bowater's case specifically states that interest expense "shall be considered related to *all* income producing activities," the regula-

tion applicable in *Dresser* used the general language that "[f]rom the items of gross income … there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated thereto." *See Dresser,* 911 F.2d at 1134 (quoting 26 C.F.R. § 1.861–8(a) (1975)).

ducing activities, such as stocks, new plants and equipment, inventory, etc., in this respect. Thus, Taxpayer's—and *Dresser's*—version of the "true cost of borrowing" has no basis in the Regulation.

In any event, the plain language of the Regulation does not give us the latitude to interpret it based on impressions of how businesses "typically" conduct their affairs, or on economic theories of what constitutes the "true cost of borrowing."

The Commissioner argues that we should decline to follow *Dresser* because we should give deference to the Internal Revenue Service's interpretation of the Regulation, as announced in an "Action on Decision" published in response to the Fifth Circuit's decision in *Dresser. See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 510–12, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994). In that Action on Decision, the IRS expressly disagreed with *Dresser,* but noted that *Dresser* involved an earlier version of the regulations and stated its position that "section 1.861–8(e)(2) do[es] not provide for the netting of interest income and interest expense before allocation and apportionment." *In re: Dresser Ind., Inc., v. Commissioner,* AOD 1991–011 (July 15, 1991). Taxpayer argues that we should not give deference to the IRS's interpretation because it amounts to no more than a self-serving litigating position. *See Bowen v. Georgetown University Hospital,* 488 U.S. 204, 213, 109 S.Ct. 468, 474, 102 L.Ed.2d 493 (1988). Because we believe the Commissioner's interpretation is supported by the plain language of the Regulation, we do not rely on a rule of deference.

### IV

Taxpayer argues that the government's position would create an anomaly in the tax law between a business that borrows just enough funds to cover immediate needs, and a business that borrows funds to cover future needs while investing the cash surplus in the interim. *Dresser* makes no reference to such an anomaly, and Taxpayer offers no authori-

ty for its position. Under Taxpayer's characterization of the Commissioner's reading of the Regulation, the first business would be able to deduct less interest expense from its CTI than the second business would despite the fact that both businesses incur the same "actual interest cost." *See* Appellee's Br. at 20. This so-called anomaly rests on the premise that both businesses should be treated similarly because they incur the same "actual interest cost," defined as interest expense netted with interest income. Once again, Taxpayer's argument rests on a debatable economic theory rather than on the language of the Regulation.

In fact, we believe that Taxpayer's reading of the Regulation would itself create an anomaly between two otherwise identically situated DISCs and their related suppliers. Suppose DISC #1 invested its temporary cash surplus in interest bearing securities while DISC #2 invested in dividend paying stock. Under Taxpayer's approach, DISC #1 and its related supplier would allocate interest expense to interest income prior to allocating the remaining "net interest expense" to the income earned from the sale of export property. Meanwhile, DISC #2 and its related supplier would allocate the interest expense, unreduced by interest income, to the income earned from the sale of export property as well as to the dividends earned from the stock investment. Taxpayer's approach of allocating interest expense would result in a higher CTI in the first DISC and its related supplier than in the second, solely because of the nature of the investment of the surplus funds. Yet as discussed above, the Regulation is clear on its face that for purposes of determining CTI, investment of surplus funds in activities that produce income called interest should be treated no differently from investment in activities that produce income called dividends. Taxpayer attempts to justify this anomaly by pointing to differences, *inter alia,* in the level of risk involved in stocks versus bonds.[7] We note, first, that the onetime conventional wisdom

---

**7.** Taxpayer notes that (1) stock dividends, unlike interest payments, are not guaranteed as to payment or timing; (2) stock prices can fluctuate widely, even over short time intervals, while debt generally will not; and (3) debt generally must be paid in full before stockholders recover in the event of financial difficulty.

that bonds are less risky than stocks seems no longer valid in the age of volatile interest rates, as vividly illustrated by the recent savings and loan debacles and the Orange County bankruptcy. In any case, Taxpayer's cited distinctions are irrelevant because they do not change the core fact that income from both stocks and bonds. qualifies as income from income producing activities. The distinctions between the two types of securities fail to justify a judicially created exception to the Regulation's clear mandate that interest expense be allocated to all income producing activities.

Taxpayer argues that temporary regulation § 1.861–9T(a), issued after the tax years at issue here, also supports its position. The temporary regulation amends the language of the Regulation that was in effect during the relevant tax years, adding the sentence, "The term interest refers to the gross amount of interest expense incurred by a taxpayer in a given tax year." 26 C.F.R. § 1.861–9T(a) (1996). The amendment was made prospective only. We agree with the Commissioner that the temporary regulation merely reiterates, or clarifies, the Regulation at issue here, and find no merit to Taxpayer's argument that the temporary regulation substantially changed the rules for the apportionment of interest expense.

### CONCLUSION

We conclude that Treasury regulation § 1.861–8(e)(2) of the 1978 regulations does not permit Taxpayer to increase the CTI of its DISCs and their related suppliers under 26 U.S.C. § 994, and thereby increase the income of its DISCs, which is subject to preferential tax treatment, by allocating interest expense to interest income and allocating only the balance to all other income producing activities.

The decision of the Tax Court is RE-VERSED.